# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF SAN DIEGO,<br><br>                           Plaintiff,<br>   v.<br>MM SAN DIEGO, LLC,<br><br>                          Defendant.<br><hr>MM SAN DIEGO, LLC; NEO SAN DIEGO LLC,<br><br>                      Counterclaimants,<br>   v.<br>CITY OF SAN DIEGO,<br><br>                      Counterdefendant. | CASE NO. 16cv964-WQH-BGS<br><br>ORDER |

HAYES, Judge:

The matter before the Court is the Motion for Declaratory Judgment filed by Plaintiff and Counterdefendant the City of San Diego. (ECF No. 42).

**I. Background**

On March 1, 2016, the City of San Diego ("the City") filed the Complaint in the Superior Court of the County of San Diego alleging breach of contract causes of action against MM San Diego, requesting declaratory relief, and demanding that MM San Diego account for transactions for a certain period pursuant to two contracts between the parties. (ECF No. 1). On April 21, 2016, MM San Diego removed the matter to this

Court. *Id.*

The allegations of the Complaint generally arise from a dispute related to contracts between the parties governing MM San Diego's sale of electricity to the City for use at the North City Water Reclamation Plant and the Metropolitan Biosolids Center.[1] The City's fifth cause of action for declaratory relief states in part: "Plaintiff desires a judicial determination of its rights and duties and a declaration that plaintiff is entitled to receive the benefits of the contract which include standby service from the Utility Company for demand of 3500kW and is not required to reduce it[s] power consumption from SDG&E when defendant's power production has ceased." *Id.* ¶ 84.

On December 16, 2016, the Magistrate Judge issued an order bifurcating discovery and setting a briefing schedule. (ECF No. 37). The Order states, "The parties may continue to purse only discovery related to whether the City of San Diego was or was not contractually obligated to reduce power usage at certain times under the relevant contracts. The City will file its motion addressing this issue on or before January 13, 2017." *Id.* at 1.

On January 12, 2017, the City filed a combined Motion for Declaratory Judgment and Motion for Partial Summary Judgment. (ECF No. 42). On January 26, 2017, the City filed a Notice of Withdrawal of City's Motion for Partial Summary Judgment pursuant to a joint stipulation between the parties but stated that the Motion for Declaratory Judgment remains pending before the Court. (ECF No. 45). The City moves for summary judgment[2] on its fifth cause of action for declaratory relief and seeks adjudication of three clauses in one of the contracts between the City and MM San Diego. (ECF No. 42-1). The City contends that the language of the contract is

---

[1] Only the contract associated with the Metropolitan Biosolids Center is at issue in this motion.

[2] The Court construes this motion for declaratory relief as a motion for partial summary judgment on the fifth cause of action in the City's complaint. *See Kam-Ko Bio-Pharm Trading Co. Ltd-Australasia v. Mayne Pharma (USA) Inc.*, 560 F.3d 935, 943 (9th Cir. 2009) ("The district court thus properly construed [the] 'motion' for declaratory judgment as a motion for summary judgment on [the] 'action' for declaratory judgment.").

unambiguous and entitles it to an order of this Court declaring that the contract does not obligate the City to "reduce its power consumption from SDG&E when defendant's power production has ceased." (ECF No. 1-2 at ¶ 84). MM San Diego contends that the language of the contract is reasonably susceptible to an interpretation requiring the the City to reduce electrical load when MM San Diego's power consumption has ceased and it is commercially reasonable for the City to reduce its electrical load. (ECF No. 48).

**II. Legal Standard**

"A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). The materiality of a fact is determined by the substantive law governing the claim or defense. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).

The moving party has the initial burden of demonstrating that summary judgment is proper. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153 (1970). "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *C.A.R. Transp. Brokerage Co., Inc. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citing *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir.1992)). "In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *Id.* (citing *Houghton*, 965 F.2d at 1537). The burden then shifts to the opposing party to provide admissible evidence beyond the pleadings to show that summary judgment

is not appropriate. *See Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 322, 324. The opposing party's evidence is to be believed, and all justifiable inferences are to be drawn in its favor. *See Anderson*, 477 U.S. at 255.

**III. Facts**

MM San Diego operates facilities that provide electricity to the City for use at two locations, the Metro Biosolids Center ("MBC") and the North City Water Reclamation Plant ("NCWRP"). Two separate agreements (the "Cogeneration Agreements") govern the supply of electrical services to each location. In this motion, the City requests adjudication of only certain provisions of the Metropolitan Biosolids Center Contract (the "MBC Contract"). The relevant section of the MBC Contract, Section 9.3 provides:

> SECTION 9.3 <u>SALE AND PURCHASE OF COGENERATION FACILITY PRODUCTS AFTER BIOSOLIDS TREATMENT FACILITY COMPLETION DATE</u>. (A) <u>Electricity</u>. Commencing on the earlier to occur of (i) the Biosolids Treatment Facility Completion Date or (ii) October 1, 1998 (the "Take Date"), the Cogenerator shall supply to the City electricity from the Facility, and the City shall purchase and receive delivery of, electricity for use in the Biosolids Treatment Facility in an amount equal to the Biosolids Treatment Facility Requirements. For purposes of this Agreement, "Biosolids Treatment Facility Requirements" means the Biosolids Treatment Facility demand for electricity in kilowatts at any given time. The City shall meet the Biosolids Treatment Facility Requirements first from any electricity made available from the Cogeneration Facility, and shall use alternative sources of electricity only to the extent that the Cogeneration Facility does not supply all of the Biosolids Treatment Facility Requirements. After the Take Date until the first anniversary of the Biosolids Treatment Facility Completion Date, regardless of the actual level of such requirements, however, the City shall take and pay for a minimum of 8,760,000 kWh per Contract Year. After the first anniversary of the Take Date and through the term of this Agreement, regardless of the actual level of such requirements, however the City shall take and pay for a minimum of 24,000,000 kWh per Contract Year; provided, however, the City shall not be required to pay for such minimum amount to the extent such minimum amount is not available for delivery by the Cogenerator. (In the event that the minimum amount must be calculated for any period less than a full Contract Year, the minimum amount specified in the preceding sentence shall be prorated to the number of days in such period.) If the Cogenerator sells and receives payment for electricity generated by the Cogeneration Facility to the Utility Company or any other electricity purchaser during any Contract Year as to which the City purchases less kilowatt hours of electricity than such minimum so required to be purchased by the City, then the City shall remain responsible to the Cogenerator for the electricity required to be purchased by the City in an amount equal to the difference, if any, between the price for such electricity actually received by the Cogenerator

and such higher amount which the Cogenerator would have been entitled to receive from the City under the terms of this Agreement.

(B) <u>Obligation of Cogenerator to Pay Shortfall Damages in Certain Circumstances.</u> Subject to the occurrence of Uncontrollable Circumstances, if the Cogenerator fails to provide the Biosolids Treatment Facility Requirements at any time, the City shall obtain electricity from other sources ("Alternative Suppliers") in an amount equal to the shortfall in provision by the Cogenerator of the Biosolids Treatment Facility Requirements (a "Shortfall Amount"). (Failure to deliver the Biosolids Treatment Facility Requirements shall not constitute a breach hereunder as long as the Cogenerator pays the amounts specified below.) The City shall use commercially reasonable efforts to obtain any Shortfall Amount from Alternative Suppliers at the lowest available total cost, and in a manner which minimizes any demand or service charges (to the extent practicable). If the Cogenerator fails to provide the Biosolids Treatment Facility Requirements due to Uncontrollable Circumstances, then the Cogenerator shall not be obligated to reimburse the City for the cost of supplying any Shortfall Amount. If the Cogenerator fails to provide such electricity for any reason other than Uncontrollable Circumstances, then the City's costs of supplying Shortfall Amounts from Alternative Suppliers in any Contract Year which are in excess of the amount that the City would have paid the Cogenerator for such electricity had such electricity been supplied by the Cogenerator shall be reimbursed to the City by the Cogenerator; provided, however, that the Cogenerator shall not be responsible for reimbursement of any excess costs of the City to the extent such costs are attributable to the Biosolids Treatment Facility Requirements exceeding 3600 kilowatts at any time. The obligations of the Cogenerator pursuant to this Section shall be in addition to, and not in substitution for the Cogenerator's obligations to supply emergency power upon Utility Company unavailability as specified in Section 9.3(B).

(C) <u>Standby Service</u>. Subject to Section 11.2 hereof, the Cogenerator shall obtain from the Utility Company and pay for standby electrical service for demand of 3500 kW for the benefit of the City. If for any period during the term of this Agreement the City is obligated to pay a supplemental demand charge to the Utility Company by reason of an unexcused failure of the Cogenerator to supply electric power pursuant to the terms hereof, the Cogenerator shall pay to the City or shall deduct from any invoice or invoices payable by the City, an amount equal to the aggregate of such demand charges up to 3500 kW. In the event that the practices or tariffs of the Utility Company require the City to be the contract party in any arrangements for standby electrical service pursuant to this Section, the Cogenerator shall reimburse the City for any costs of such standby electrical service for which the Cogenerator would otherwise be responsible pursuant to this Section. The City, or its contractor designated to operate the City's facilities, shall at its expense maintain standby Hot Water and Chilled Water service with a minimum capacity to meet its needs during periods when the Cogeneration Facility is partially or entirely shut down.[3]

---

[3] On February 1, 2011, the parties agreed to the Amendments to the Cogeneration Agreements. (ECF No. 48-3 at 7). MM San Diego contends that the sections of the agreements relevant to this matter were "not amended in any manner whatsoever in

(ECF Nos. 42-9 at 2-4; 48-2 at 6-8).

**III. Contentions of the Parties**

The City contends the plain language of Sections 9.3(A), 9.3(B), and 9.3(C) of the MBC Contract provides that the City is not obligated to reduce its electrical demand at times when MM San Diego does not produce sufficient energy and the City obtains the Shortfall Amount from alternative suppliers. (ECF No. 42-1 at 12). The City contends that at the time of contract, the "mutual understanding" between the parties was that the MBC Contract required the City to obtain any Shortfall Amount "at the lowest total cost (including commodity and demand charges)" but did not require the City to reduce any electrical demand in order to reduce the total cost. *Id.* at 21; *see also* ECF No. 49 at 5. The City contends that its interpretation of the MBC Contract is consistent with contract principles involving the sale of goods on a requirements contract. (ECF No. 42-1 at 14-16). The City contends that the MBC Contract is an integrated contract unambiguous in its terms and that extrinsic evidence is impermissible to interpret the meaning of the contract. (ECF No. 49 at 6-7). Further, the City contends that MM San Diego's interpretation is inconsistent with the plain meaning of the MBC Contract as a whole. The City contends that MM San Diego's interpretation impermissibly "redefine[s] the meaning of 'Biosolids Treatment Facility Requirements' to mean something else at times when Defendant's generators are not meeting the *actual* Biosolids Treatment Facility's demand for electricity in kilowatts at any given time." (ECF No. 42 at 14-13).

MM San Diego contends that the language "commercially reasonable efforts" and "in a manner which minimizes demand and other charges" in Section 9.3(B) can be reasonably interpreted to include an obligation to reduce electrical load during MM San Diego outages at times when the reduction is commercially reasonable. (ECF No. 48 at 12-13). MM San Diego contends that extrinsic evidence is admissible to aid in the

---

2011." (ECF No. 48 at 7-8). The City "agrees that the 2011 Amendments did not modify Section 9.3." (ECF No. 49 at 9).

interpretation of the MBC Contract and raises questions of fact improper for resolution on summary judgment. *Id.* MM San Diego contends that extrinsic evidence demonstrates that "'commercially reasonable efforts' to 'minimize' demand and other charges can be interpreted to include reducing electrical load during MMSD outages, and summary judgment is therefore improper." *Id.* at 13. MM San Diego contends that reducing electrical load during MM San Diego outages is a commercially reasonable manner to minimize demand charges. *Id.* at 20. MM San Diego contends that a determination of what constitutes "commercially reasonable efforts" is a factual question improper for resolution on summary judgment. *Id.* at 13.

**IV. Applicable Law**

"Under California law, '[t]he fundamental goal of contract interpretation is to give effect to the mutual intent of the parties as it existed at the time of contracting.'" *Skilstaf, Inc., v. CVS Caremark Corp.*, 669 F.3d 1005, 1014-15 (9th Cir. 2012) (citing *Miller v. Glenn Miller Prods.*, 454 F.3d 975, 989 (9th Cir. 2006) (per curiam)). "Under California law, '[t]he language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity.'" *F.B.T. Prods., LLC v. Aftermath Records*, 621 F.3d 958, 963 (9th Cir. 2010) (citing Cal. Civ. Code § 1638). "When a contract is reduced to writing, the parties' intention is determined from the writing alone, if possible." *Cedars-Sinai Med. Ctr. v. Shewry*, 41 Cal. Rptr. 3d 48, 60 (Ct. App. 2006) (citing *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 135 Cal. Rptr. 2d 505 (Ct. App. 2003)).

"Because California law recognizes that the words of a written instrument often lack a clear meaning apart from the context in which the words were written, courts may preliminarily consider any extrinsic evidence offered by the parties." *Miller*, 454 F.3d at 989-90. To interpret a contract, courts follow a two-step analysis:

> First, the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine "ambiguity," i.e., whether the language is "reasonably susceptible" to the interpretation urged by a party. If in light of the extrinsic evidence, the court decides the language is "reasonably susceptible" to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step –

interpreting the contract.

*F.B.T.*, 621 F.3d at 963 (quoting *Winet v. Price*, 6 Cal. Rptr. 2d 554, 557 (Ct. App. 1992)). "The initial question whether a contract is ambiguous is . . . one of law." *Niederer v. Ferreira*, 234 Cal. Rptr. 779, 787 (Ct. App. 1987). "If, after considering the language of the contract and any admissible extrinsic evidence, the meaning of the contract is unambiguous a court may properly interpret it on a motion for summary judgment." *Miller*, 454 F.3d at 990.

**V. Discussion**

In order for the City to prevail on summary judgment, the City must show that no reasonable interpretation of the MBC Contract obligates the City to "reduce it[s] power consumption from SDG&E when defendant's power production has ceased." (ECF No. 1 ¶ 84).

Section 9.3(A) of the MBC Contract provides in part that

> the Cogenerator shall supply to the City electricity from the Facility, and the City shall purchase and receive delivery of, electricity for use in the Biosolids Treatment Facility in an amount equal to the Biosolids Treatment Facility Requirements. For purposes of this Agreement, "Biosolids Treatment Facility Requirements" means the Biosolids Treatment Facility demand for electricity in kilowatts at any given time.

(ECF No 42-9 at 3; ECF No. 48-2 at 7). Section 9.3(B) defines the term "Shortfall Amount" as the "amount equal to the shortfall in provision by the Cogenerator of the Biosolids Treatment Facility Requirements." (ECF No 42-9 at 3; ECF No. 48-2 at 7). Section 9.3(B) of the MBC Contract further provides, "The City shall use commercially reasonable efforts to obtain any Shortfall Amount from Alternative Suppliers at the lowest available total cost, and in a manner which minimizes any demand or service charges (to the extent practicable)." (ECF No 42-9 at 3; ECF No. 48-2 at 7).

The language in Section 9.3(B) requires the City to use "commercially reasonable efforts" to obtain the Shortfall Amount at the lowest total available cost and in a manner which minimizes demand charges. Demand charges can be minimized through a

reduction in electrical load.[4] The Court concludes that this language in Section 9.3(B) of the MBC Contract is reasonably susceptible to MM San Diego's interpretation that the MBC Contract obligates the City to reduce power consumption at times when the City obtains the Shortfall Amount from an alternative supplier and a reduction in power consumption is commercially reasonable. *See Cedars-Sinai Med. Ctr.*, 41 Cal. Rptr. 3d at 60 ("Whether the contract is reasonably susceptible to a party's interpretation can be determined from the language of the contract itself or from extrinsic evidence of the parties' intent."). Accordingly, the Court cannot conclude as a matter of law that the language of the MBC Contract provides that the City "is not required to reduce it[s] power consumption from SDG&E when defendant's power production has ceased." (ECF No. 1 ¶ 84). Viewed in the light most favorable to the nonmoving party, the City has not satisfied its burden of establishing that partial summary judgment on its fifth cause of action for declaratory relief is proper.

## VI. Conclusion

IT IS HEREBY ORDERED that the Motion for Declaratory Judgment filed by the City is DENIED. (ECF No. 42).

DATED: September 12, 2017

**WILLIAM Q. HAYES**
United States District Judge

---

[4] At oral argument, the City agreed that one way to minimize demand charges is to reduce electrical demand.